IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| EDWARD COYNE AND WEST RICHLAND CITIZENS FOR SMART GROWTH, | ) ) ) ) | No. 33653-1-III |
| Appellants, | ) ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| GROWTH MANAGEMENT HEARINGS BOARD, CITY OF WEST RICHLAND, AND CHARLES GRIGG, | ) ) ) ) ) | |
| Respondents. | ) | |

KORSMO, J. — Edward Coyne and the West Richland Citizens for Smart Growth (Coyne) appeal from a decision of the Growth Management Hearings Board (GMHB) rejecting their challenge to an amendment to the West Richland comprehensive plan. We conclude that a city does not "consider" an application merely by placing it on a docket, reject the remaining arguments, and affirm.

## FACTS

This controversy has its genesis in an effort to rezone a lot from low-density residential to commercial in order to develop a hardware store. The property, referred to here as lot 29, sits on Bombing Range Road between Austin Drive and W. Van Giesen Street in West Richland. Mr. Charles Grigg purchased the undeveloped property and began efforts to change the zoning.

No. 33653-1-III
*Coyne, et al. v. Growth Mgmt. Hr'g Bd, et al.*

Mr. Grigg submitted his application prior to January 31, 2012, and requested that West Richland amend its comprehensive plan to accommodate the change.[1] The West Richland City Council (City Council) first addressed the proposed amendments on November 6, 2012. At that time, the City Council approved the comprehensive plan list and forwarded it to the planning commission. This established the "2012 Docket for Comprehensive Plan Amendments." Clerk's Papers (CP) at 319. At this time, Mr. Grigg's property was the only property in the vicinity of Bombing Range Road and Van Giesen. However, one of the council members clarified that "the Planning Commission is not limited to the property being proposed for changes in the private applications, but can look at adjacent properties and make proposals on those." *Id.*

In January 2013, the mayor of West Richland invited property owners in the area of Bombing Range and Van Giesen to a meeting to discuss the potential comprehensive plan changes. On February 5, the City Council held a workshop, and the planning director updated the City Council on the 2012 comprehensive plan docket. At the end of that meeting, the City Council's consensus was to seek the recommendation of the Planning Commission concerning the proposed amendments.

Following this workshop, the City purchased lot 28, the lot immediately adjacent to lot 29. The City recorded its deed on February 25, 2013. Around the same time, Mr.

---

[1] One other property owner also sought a comprehensive plan change for property in a different part of West Richland. That property is not at issue in this case.

2

Grigg purchased another area property, lot 1. Lot 1 is directly across Austin Drive from lots 28 and 29. The Planning Commission held a workshop on March 14, 2013, where it added the two new properties to the 2012 comprehensive plan proposals docket.[2] CP at 292.

With these two additional properties now part of the docket, the Planning Commission held a public meeting on April 11, 2013. Prior to this meeting, the City sent out notices to all property owners within 600 feet of the affected parcels, arranged for a notice of the meeting to be published in the Tri-City Herald, and posted notice on various public buildings within the city. Public notice signs were also posted at the properties. After hearing public comment at the April 11 meeting, the Planning Commission voted *against* adopting the comprehensive plan changes as to lots 1, 28, and 29, but recommended approval of some unrelated changes.

After the Planning Commission's negative recommendation, the City Council held three workshops on the comprehensive plan recommendations. Ultimately, the Council scheduled a public meeting to consider the comprehensive plan change proposals (including lots 1, 28, and 29). The City scheduled the meeting for June 17, 2013, and arranged for the newspaper to publish notice of the meeting. It also mailed notice to the

---

[2] There is some suggestion in the record that the planning staff had been considering a wider area surrounding Mr. Grigg's original lot from the beginning. *See* CP at 292 ("At this point, any additional parcels which had been previously studied for consideration were no longer included as part of the proposed amendment.").

adjacent property owners and anyone who had previously spoken with regard to the 2012 comprehensive plan amendments docket. At that meeting, the City Council heard public comment on the proposed changes.

At a subsequent meeting, the City Council voted to approve the amendments to the comprehensive plan, adopting Ordinance No. 25-13. The ordinance changed the designation on the plan map for the three properties from residential to commercial. Contemporaneously with the change to the comprehensive plan, the City adopted Ordinance No. 26-13, which rezoned the properties from low-density residential to commercial general.

Mr. Coyne timely appealed the decision of the City Council to the GMHB, asserting a number of violations of the Growth Management Act, ch. 36.70A RCW (GMA). Before the GMHB, appellants appeared pro se and raised fourteen issues, all of which the City opposed.[3] Some of the issues did not provide specific reference to the GMA. At oral argument, the board members repeatedly asked for clarification on what specific provisions of the GMA the city allegedly violated. When the GMHB also questioned how the zoning change to commercial general was inconsistent with the comprehensive plan, Ms. Hauer responded that it was, in fact, consistent, but that other designations would also have been consistent. CP at 850-852.

---

[3] Mr. Coyne did not personally argue before the GMHB; Ms. Leslie Hauer spoke on behalf of Mr. Coyne and the organization.

4

Ultimately, the GMHB rejected all of the challenges. It found the challengers had not demonstrated an actual violation of the GMA and thus not met their burden of proof: "The Board finds and concludes Petitioners failed to satisfy their burden of proof to demonstrate that [the ordinances] were clearly erroneous in view of the entire record before the Board and in light of the goals and requirements of the Growth Management Act." CP at 733. In issuing its decision, however, the GMHB did not make formal findings of fact or conclusions of law. Rather, it issued a "Final Decision and Order" in which it analyzed the issues and made conclusions.

Represented by counsel, Mr. Coyne petitioned the Benton County Superior Court for judicial review of the GMHB decision. Both parties requested attorney fees pursuant to RCW 4.84.350. The superior court ultimately dismissed the petition. Our record does not indicate whether the trial court ruled on the respective attorney fee requests.

Still represented by counsel, Mr. Coyne appealed to this court. A panel heard oral argument. Subsequently, we directed the parties to identify portions of the record that answered the court's questions concerning the content of the public notice given prior to the June 17, 2013 meeting.

## ANALYSIS

This appeal presents several procedural challenges to the comprehensive plan amendment process, which we address in the following order: (1) the necessity of findings by the GMHB, (2) the addition of the two other lots to the original docket notice

5

No. 33653-1-III
*Coyne, et al. v. Growth Mgmt. Hr'g Bd, et al.*

for lot 29, (3) the adequacy of public notice concerning the comprehensive plan change, (4) whether the amendments constituted illegal spot zoning, and (5) whether the amendments were consistent with the comprehensive plan.[4]

This court reviews a GMHB decision under the Administrative Procedure Act, ch. 34.05 RCW (APA). *Feil v. E. Wash. Growth Mgmt. Hr'gs Bd.*, 172 Wn.2d 367, 376, 259 P.3d 227 (2011). This court applies APA standards directly to the record before the GMHB, performing the same function as the superior court. *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 136 Wn.2d 38, 45, 959 P.2d 1091 (1998). The party challenging the decision bears the burden of proving it invalid. RCW 34.05.570(1)(a). A decision is invalid if it suffers from at least one of nine enumerated infirmities. RCW 34.05.570(3).

*Findings*

Mr. Coyne argues that the GMHB was required—and failed—to make formal findings of fact and conclusions of law. The "Final Decision and Order" are sufficient to understand the ruling of the GMHB.

---

[4] Both sides also seek attorney fees under the "Equal Access to Justice Act," RCW 4.84.350. However, that act does not apply to GMHB actions. *Spokane County v. E. Wash. Growth Mgmt. Hr'gs Bd.*, 176 Wn. App. 555, 584, 309 P.3d 673 (2013).

Mr. Coyne points to no provision of the GMA mandating a specific form in which the GMHB must report its rulings.[5] He relies on our decision in *Citizens for Responsible and Organized Planning v. Chelan County*, 105 Wn. App. 753, 21 P.3d 304 (2001). There we reversed a decision by the Chelan County Board of Commissioners that failed to address the primary issue argued by the parties. *Id.* at 755. We remanded for the county commissioners to make appropriate findings. *Id.* Without a determination of what facts the commissioners had found, this court could not apply the law to the findings to resolve the case. *Id.* at 762.

While we can envision cases where the GMHB decision does not adequately explain matters to permit appellate review, this is not one of those cases. There is no need for additional findings of fact because the GMHB essentially found that Mr. Coyne did not meet his burden. Before the GMHB, the burden is on the petitioner to demonstrate the City violated some provision of the GMA by its action; the GMHB

---

[5] The GMA does not require formal findings. The relevant statutes are RCW 36.70A.290 and 36.70A.300, but neither of them require formal findings of fact. RCW 36.70A.300 requires that the board "issue a final order . . . based exclusively on whether or not a state agency, county, or city is in compliance with the requirements of this chapter." It does not otherwise specify what form the order must take. Further, RCW 36.70A.290 indicates only that the "board shall render written decisions articulating the basis for its holdings," and precludes the board from "issu[ing] advisory opinions." The decision in *King County v. Central Puget Sound Growth Management Hearings Bd.*, 142 Wn.2d 543, 14 P.3d 133 (2000), appears to assume that the board makes findings of fact and conclusions of law, but it does not require so specifically. *Id.* at 553 (stating the court reviews legal conclusion de novo, and findings of fact for substantial evidence).

7

presumes the City's conduct is valid. RCW 36.70A.320(1). Perhaps to help the petitioners, who appeared pro se, the board members repeatedly asked during oral argument for them to be very precise about what specific provisions of the GMA the City violated, explaining that the GMHB only has jurisdiction to review violations of the GMA itself. Ultimately, the GMHB found the petitioners did not adequately point to specific violations of the GMA. Thus, the GMHB did not need to resolve disputed facts for its ultimate disposition. It merely noted that the petitioners failed to meet their burden: "[T]he Board finds and concludes Petitioners failed to satisfy their burden of proof to demonstrate that [the ordinances] were clearly erroneous in view of the entire record before the Board and in light of the goals and requirements of the Growth Management Act." CP at 733; *see also* CP at 734, 737, 740 (making essentially the same conclusion on each of the four main issues).

The decision was sufficient. It adequately explained the ruling. No more was required of it.

*Docketing of Change Requests*

Mr. Coyne also argues that West Richland violated the GMA by considering comprehensive plan changes more than once during the year due to the fact that it added lots 1 and 28 to the list under consideration after the City Council approved the original docket. We conclude that adding items to an agenda over the course of a year does not amount to "consideration" of the item on multiple occasions.

8

No. 33653-1-III
*Coyne, et al. v. Growth Mgmt. Hr'g Bd, et al.*

This issue presents a question of pure statutory interpretation, a matter this court reviews de novo. *State v. Bradshaw*, 152 Wn.2d 528, 531, 98 P.3d 1190 (2004). A court begins by looking at the plain meaning of the statute as expressed through the words themselves. *Tesoro Ref. & Mktg. Co. v. Dep't of Revenue*, 164 Wn.2d 310, 317, 190 P.3d 28 (2008). If the statute's meaning is plain on its face, the Court applies the plain meaning. *State v. Armendariz*, 160 Wn.2d 106, 110, 156 P.3d 201 (2007). Only if the language is ambiguous does the court look to aids of construction, such as legislative history. *Id.* at 110-111. A provision is ambiguous if it is reasonably subject to multiple interpretations. *State v. Engel*, 166 Wn.2d 572, 579, 210 P.3d 1007 (2009). While this court reviews the GMA de novo, it gives substantial weight to the growth board's interpretation.[6] *Manke Lumber Co., Inc. v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 113 Wn. App. 615, 622, 53 P.3d 1011 (2002). As relevant to this issue, the order is invalid if the GMHB "erroneously interpreted or applied the law." RCW 34.05.570(3)(d).

The relevant statute is RCW 36.70A.130(2):

Each county and city shall establish and broadly disseminate to the public a public participation program consistent with RCW 36.70A.035 and 36.70A.140 that identifies procedures and schedules whereby updates, proposed amendments, or revisions of the comprehensive plan *are considered by the governing body of the county or city no more frequently*

---

[6] Here, the GMHB did not analyze this section of the GMA. Therefore, there is nothing on which to give deference.

9

> *than once every year*. . . . Amendments may be considered more frequently than once per year under the following circumstances.

(Emphasis added.)

The issue hinges on what the legislature meant by the language "considered by the governing body." *Id.* In this case, "governing body" must refer to the City Council because only the Council can approve or reject amendments to the comprehensive plan. However, what the legislature meant by the word "consider" is not specifically known, and the statute includes no definition. Where a word is undefined, courts give the word its ordinary meaning. *Lake v. Woodcreek Homeowners Ass'n*, 169 Wn.2d 516, 528, 243 P.3d 1283 (2010). To determine a word's ordinary meaning the court may consult a dictionary. *Id.* As relevant, the verb "consider" is defined as: "to give thought to with a view of . . . adopting." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 483 (1993). With this definition, the meaning of the statute becomes plain: the City Council may not consider *adopting* changes to the comprehensive plan more than once a year.

Using this understanding of "consider," the issue is easily resolved. The City Council's first involvement with the rezone occurred in November 2011, when it held a public meeting approving the "Comprehensive Plan Amendment List," which established the docket, and then forwarded it to the Planning Commission for review. At this time, the two additional properties were not included. A series of "workshops" followed this meeting, some of which involved the City Council. At all but one of these workshops, the

10

additional properties had already been added to the agenda. At the first workshop, where the properties had not yet been added, the Planning Director merely updated the City Council on the progress of the proposed amendments. Finally, on June 17, 2013, the City Council held a public meeting to consider whether to adopt the proposed changes to the comprehensive plan. This is the only time the City Council considered the amendments *for adoption*, and it included the two additional properties. Mr. Coyne has pointed to no other meetings where the City Council considered adopting any other comprehensive plan amendments within one year of the June 17th meeting. Therefore, the City did not violate RCW 36.70A.130(2) when it amended the docket prior to formal consideration of the changes to the comprehensive plan.

Mr. Coyne argues that after the November 2012 meeting, the docket was "set in stone" and could not be changed. This argument lacks any support in the statutory language. The only way the argument could prevail is if the Council's approval and establishment of the amended docket constituted actual consideration of the amendments themselves. Such an interpretation contradicts the plain meaning of "consider" discussed above. The City Council was not formally considering the amendments *for approval* at the November meeting. Rather, the council was merely forwarding them through the appropriate process.[7]

---

[7] Other provisions clarify that *docketing* is distinct from *considering*. RCW 36.70A.470 prohibits cities and counties from using project planning procedures to make

Mr. Coyne also argues that the City violated the GMA by not following its own procedures, which it adopted pursuant to the GMA. This argument also fails. While the GMA requires a municipality to adopt some sort of procedures for amending the comprehensive plan, it does not always specify what is required. *See* RCW 36.70A.035 (discussing "notice procedures that are reasonably calculated to provide notice to property owners"); RCW 36.70A.130(2)(a) (requiring the municipality to "establish and broadly disseminate to the public a public participation program"); RCW 36.70A.140 (requiring procedures for "early and continuous public participation in the development and amendment of comprehensive land use plans"). Mr. Coyne, however, does not argue that the adopted procedures are insufficient, but rather that the City did not follow the adopted procedures. CP at 892 ("[Board member:] Is that correct: The procedures are okay, but they didn't follow them? Ms. Hauer: Yes, sir.").

On this issue, the municipal code (WRMC) is not clear. Mr. Coyne reads two provisions of the WRMC to require that the City receive *internal* proposals for

comprehensive plan or land use decisions. It requires that the county include procedures for suggested plan amendments, and that those amendments be "docketed and considered." RCW 36.70A.470(2). It then defines docketing: "docketing refers to compiling and maintaining a list of suggested changes to the comprehensive plan or development regulations in a manner that will ensure such suggested changes will be *considered* by the county or city." RCW 36.70A.470(4) (emphasis added). This definition distinguishes docketing from considering. The county or city "consider[s]" the changes at some point *after* it "docket[s]" them. *Id.* Therefore, when the City docketed the comprehensive plan proposals, it did not *consider* them for the purposes of RCW 36.70A.130(2)(a).

amendment to the comprehensive plan by the January 31 deadline, treating them the same as private proposals. However, those provisions do not mandate that conclusion. First, WRMC 14.09.03 outlines the submission deadline for amendments:

> Proposed amendments to the comprehensive plan or land use plan map may be submitted at any time. . . . Applications received . . . will be considered during the . . . annual review period with the last working day in January being the deadline for submittal for each annual review period.

A second provision states who can propose amendments: "Amendments may be initiated by any interested person, including applicants, citizens, and *staff of other agencies*." WRMC 14.09.060 (emphasis added). These provisions may suggest the outcome that Mr. Coyne desires, namely that staff proposals must be treated the same as private proposals and thus submitted by January 31. However, the provisions do not require that reading. Nothing in WRMC 14.09.03 defines "Proposed Amendments" to include the planning director's suggested expansion of a private proposal to include a greater area. Such an expansion could reasonably fall outside the definition of a "Proposed Amendment" under the code.

The City's practice appears to be the opposite of Mr. Coyne's reading. When the City Council was approving the docket in November 2012, one of the council members clarified that "the Planning Commission is not limited to the property being proposed for changes in the private applications, but can look at adjacent properties and make

13

proposals on those." CP at 319. Therefore, while Mr. Coyne's reading is possible, it is not necessary, and he has failed to demonstrate a violation of the WRMC.

Finally, even if Mr. Coyne had demonstrated a violation of the WRMC, it would not necessarily correlate with a violation of the GMA. Generally, a minor violation of the enacted procedures does not amount to a violation of the GMA. RCW 36.70A.140 ("Errors in exact compliance with the established program and procedures shall not render the comprehensive land use plan or development regulations invalid if the spirit of the program and procedures is observed."). In other words, municipalities need not precisely follow their own provisions so long as the spirit of the GMA is followed, namely public notice and involvement.

The docketing of lot 29 in November did not amount to a "consideration" of the merits of the rezoning and comprehensive plan amendment requests.

*Notice of Comprehensive Plan Amendments*

Mr. Coyne next argues that West Richland did not provide adequate public notice that it was considering amendments governing three lots on Bombing Range Road instead of one. The GMHB concluded, as do we, that appellants have not demonstrated any error.

A county or city planning under the GMA must establish a "public participation program identifying procedures providing for early and continuous public participation in the development and amendment of comprehensive land use plans." RCW 36.70A.140.

14

The procedures must provide for broad dissemination of proposals, opportunity for written comments, public meetings after effective notice, open discussion, communication programs, information services, and consideration of and response to public comments. *Id.* However, inexact compliance with the established public participation program and procedures does not invalidate a comprehensive plan "if the spirit of the program and procedures is observed." *Id.* This court gives deference to the GMHB's "interpretation of the statutes it administers," but the standard of review is de novo. *Manke*, 113 Wn. App. at 622.

Also relevant are two related provisions of the GMA. RCW 36.70A.130(2) requires the city to create a public participation program: "Each county and city shall establish and broadly disseminate to the public a public participation program." RCW 36.70A.130(2)(a). RCW 36.70A.035 mandates public participation requirements that are "reasonably calculated to provide notice to property owners and other affected and interested individuals." RCW 36.70A.035(1). It then lists specific examples of "reasonable notice provisions," including "Publishing notice in a newspaper" and "Notifying public or private groups with known interest in a certain proposal." *Id.*

Mr. Coyne argues that the notice and public participation here were insufficient because properties were added during the process. On this issue, the GMHB ruled that appellants had not proven their case and indicated that "RCW 36.70A.035 does not

15

prescribe a particular type of notice that is required at the earlier stages of process for amending a comprehensive plan." CP at 732.

Mr. Coyne does not point to a violation of any of these provisions. The City arranged for notice to appear in the local newspaper prior to the Planning Commission meeting on April 11, 2013, and the City Council public meeting on June 17, 2013.[8]

---

[8] The West Richland code describes comprehensive plan changes, development regulations, zoning ordinance text amendments, and area-wide zoning map amendments as "Type VII" actions. WRMC 14.01.030(B)(7). For Type VII actions, WRMC 14.03.030(B)(4) requires that the City post notices "*as described in subsection A* of this section *on the official city website* and notify the news media." (Emphasis added.)
Subsection A requires as follows:
A. Content of Notice of Public Hearing for All Applications. The notice of a public hearing required by this chapter shall contain:
1. The name and address of the applicant or the applicant's representative;
2. *Description of the subject property reasonably sufficient to inform the public of its location, including but not limited to a vicinity location or written description, a map or postal address*, and a subdivision lot and block designation, but need not include a legal description;
3. The date, time and place of the hearing;
4. The nature of the proposed use or development;
5. A statement that all interested persons may appear and provide testimony;
6. The sections of the code that are pertinent to the hearing procedure;
7. A statement explaining when information may be examined, and when and how written comments addressing findings required for a decision by the hearing body may be admitted;
8. The name of a city representative to contact and the telephone number where additional information may be obtained;
9. A statement that a copy of the application materials are available for inspection; and
10. A statement explaining that a copy of the staff report will be available for inspection prior to the hearing.
WRMC 14.03.030(A) (emphasis added).

Further, the planning staff mailed letters to property owners adjacent to the affected properties. Notices were posted on the properties[9] that included copies of the comprehensive plan map. All of these actions gave interested individuals the opportunity to come to the public meetings and participate in the discussion. Since the City gave three different types of notice from the examples listed in RCW 36.70A.035(1), the notice was sufficient.

Mr. Coyne specifically points to RCW 36.70A.035(2) as requiring a new review and comment period. Mr. Coyne is correct that the provision requires additional

---

From these provisions it appears the formal notice (including the property description) need only appear on the website and news, not necessarily on any mailings. However, a separate chapter discusses comprehensive plan changes more thoroughly, and it also discusses notice:

> A notice of public hearing(s) on proposed amendments to the comprehensive plan shall be sent to the news media and posted on the city's official website. *For site-specific land use map amendment proposals (i.e., sites involving four or fewer parcels, or sites consisting of multiple contiguous parcels under a single ownership), the notice of public hearing shall be mailed to all property owners within 600 feet of the subject site.* Notices shall be both mailed and posted at least seven days prior to the scheduled public hearing.

WRMC 14.09.100 (emphasis added). It is unclear whether the "notice of the public hearing" required to be mailed under 14.09.100 must contain the content of 14.03.030(A). This particular decision involved only three properties, so it is a "site specific land use map amendment proposal," requiring mailed notice to property owners. But the notice referred to in 14.03.030 could be different from that in 14.09.100.

[9] The City and Mr. Coyne each point to the same part of the record and draw opposite conclusions as to whether or not all notice was posted on all three lots or simply the first one. The City's evidence suggested that notices were posted on all three lots.

comment and review in certain situations, but is incorrect that *this situation* required

additional comment and review. The statute states:

> [I]f the legislative body for a county or city chooses to consider a change to an amendment to a comprehensive plan or development regulation, *and the change is proposed after the opportunity for review and comment has passed under the county's or city's procedures*, an opportunity for review and comment on the proposed change shall be provided before the local legislative body votes on the proposed change.

RCW 36.70A.035(2)(a) (emphasis added). Here, the City did not choose to consider the

change "after the opportunity for review and comment." RCW 36.70A.035(2)(a). The

additional properties were added to the docket in March 2013. Subsequently, the City

provided two public meetings where the public could participate and give feedback on

the proposed amendments: one before the planning commission on April 11, 2013, and

one before the City Council on June 17, 2013. Both of the meetings occurred *after* the

planning staff added the additional properties to the proposal. The City did not violate

RCW 36.70A.035(2).

The record reflects that West Richland gave multiple types of notice prior to

considering the proposal. The GMHB correctly concluded that Mr. Coyne did not

establish that the City failed to comply with the GMA.

No. 33653-1-III
*Coyne, et al. v. Growth Mgmt. Hr'g Bd, et al.*

*Spot Zoning*

Mr. Coyne also contends the rezoning constituted illegal "spot zoning." Because the GMHB did not have jurisdiction over this allegation of spot zoning, it properly found that there was no violation of the GMA.

Spot zoning occurs when there is a "zoning action by which a smaller area is singled out of a larger area or district and specially zoned for a use classification totally different from and inconsistent with the classification of surrounding land." *Smith v. Skagit County*, 75 Wn.2d 715, 743, 453 P.2d 832 (1969). No provision of the GMA expressly gives the GMHB authority to consider claims of spot zoning.[10] Most land use regulation challenges are left to the Land Use Petition Act (LUPA) process. *See* RCW 36.70C.030(1) (stating that LUPA "shall be the exclusive means of judicial review of land use decisions.")

The jurisdiction of the GMHB is limited to violations of the GMA itself. "A GMHB . . . has very limited jurisdiction." *Somers v. Snohomish County*, 105 Wn. App. 937, 21 P.3d 1165 (2001). "The growth management hearings board shall hear and determine *only* those petitions alleging either: (a) that . . . a state agency, county, or city

---

[10] There is one instance where the GMHB could address spot zoning. Any development regulation that is in conflict with a comprehensive plan also violates the GMA. *See* RCW 36.70A.040(3)(d); *Woods v. Kittitas County*, 162 Wn.2d 597, 613, 174 P.3d 25 (2007) ("Such regulations must be consistent with the comprehensive plan."). Thus, the GMHB has some jurisdiction in the case of alleged spot zoning when the zoning regulation is inconsistent with the comprehensive plan.

19

planning under this chapter *is not in compliance with the requirements of this chapter.*" RCW 36.70A.280(1) (emphasis added). "Unless a petition alleges that a comprehensive plan or a development regulation or amendments to either are not in compliance with the requirements of the GMA, a GMHB does not have jurisdiction to hear the petition." *Wenatchee Sportsmen Assn. v. Chelan County*, 141 Wn.2d 169, 178, 4 P.3d 123 (2000). For this reason, Mr. Coyne's challenge fails. He does not point to any violation of the GMA, nor did he prove that violation to the GMHB.

The jurisdiction of the GMHB is tightly controlled by statute. The GMHB does not have jurisdiction when a challenge does not involve an alleged violation of the GMA. RCW 36.70A.280(1). Only if a site-specific rezone violates a specific provision of the GMA does the GMHB have authority to hear the challenge. That did not occur here.

*Consistency with Comprehensive Plan*

The final argument is a contention that the amendments render the comprehensive plan inconsistent. The challengers conceded this issue before the GMHB, but it also is without merit.

The GMA requires a comprehensive plan be internally consistent. RCW 36.70A.070.[11] "This requirement means that differing parts of the comprehensive plan 'must fit together so that no one feature precludes the achievement of any other.'"

---

[11] "The plan shall be an internally consistent document and all elements shall be consistent with the future land use map."

20

*Brinnon Grp. v. Jefferson County*, 159 Wn. App. 446, 476, 245 P.3d 789 (2011) (quoting WAC 365-196-500). Further, all development regulations must be consistent and implement the comprehensive plan. WAC 365-196-500. While a city or county must conform its planning to the requirements of the GMA, it receives deference in its weighing and balancing of various goals and planning policies. *See* RCW 36.70A.3201; *see also King County v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 142 Wn.2d 543, 561, 14 P.3d 133 (2000).

Here, Mr. Coyne argues the changes make the plan internally inconsistent because they violate various goals of the comprehensive plan. He also argues that the zoning change was improper. However, appellants conceded before the GMHB that zoning the property commercial was consistent with the comprehensive plan. Board members asked at oral argument how the proposals were inconsistent with the comprehensive plan: "So is it Petitioner's contention that the zoning designation . . . the commercial general zoning designation is not consistent with the Comprehensive Plan; is that a contention or not?" CP at 850-851. Ms. Hauer replied: "Commercial general could be consistent with the Comprehensive Plan. Other designations could also be consistent and perhaps more compatible with the neighborhood." CP at 851. An attempt was made to clarify the answer: "So just to before we move on, I want to make sure I heard correctly, you're saying that the commercial general zoning designation could be consistent with the plan; you're not alleging that it is not consistent, right?" to which Ms. Hauer responded, "No.

21

However, since the specific of zoning wasn't discussed at Planning Commission, and as near as we can tell wasn't discussed at council, we don't have any record to show that that would have been *the best choice*, but yes, commercial general is one of several designations that could be consistent." CP at 851-852 (emphasis added).

On its face, the concession only speaks to the city's zoning decision; however, it logically extends to the purported internal inconsistency of the comprehensive plan as well. The only relevant change to the comprehensive plan was relabeling *the planning map* for these properties from residential to commercial. No other polices or goals were changed.[12] If *zoning* these properties commercial general is not inconsistent with the policies of the comprehensive plan, it is hard to imagine how *changing the planning map* to reflect the change makes the comprehensive plan internally inconsistent.

Although this issue has logically been conceded, we will briefly address the arguments raised. Mr. Coyne argues that three goals were violated by allowing commercial development on these sites. These arguments are either undeveloped, misread the goals, or fail to give deference to the City's interpretation. Ultimately, Mr. Coyne fails to establish any internal inconsistency.

Mr. Coyne focuses on Goal 3, Policy 4, but he misreads it. Goal 3, Policy 4 requires that the City "Encourage the use of previously passed-over parcels within areas

---

[12] There were some text amendments that are not relevant to Mr. Coyne's issues.

22

characterized by urban growth." CP at 369. However, this goal is not inconsistent with the plan change involving these properties. As the planning staff noted, two of these properties have not been developed since they were platted in the 1940s. Those properties are "passed-over parcels." It is, therefore, logical that the City would want to rethink the best use of these sites.

Mr. Coyne also argues inconsistency with two other goals. The first, Goal 5, Policy 1, requires the City to "Maintain or improve the integrity and livability of established neighborhoods." CP at 371. The second, Goal 4, Policy 1, requires the City to "Provide adequate, well-located areas for public lands and facilities." CP at 370. Mr. Coyne, however, does not articulate exactly how the first is violated by these changes and actually misstates the second. Further, he does not demonstrate how this change does not meet the goals listed by the staff and adopted by the City. In contrast, the City found these changes to be consistent with four of its stated goals, including "Encourage a walkable community by supporting small commercial nodes located within walking distance of residential development." Ultimately, the City receives deference on its balancing and weighing of the various goals and policies, and the City found the changes consistent. *See* RCW 36.70A.3201; *see also King County*, 142 Wn.2d at 561. The GMHB did not err in concluding that no violation of the GMA was established.

No. 33653-1-III
*Coyne, et al. v. Growth Mgmt. Hr'g Bd, et al.*

No violation of the GMA, nor any error by the GMHB, having been established,

we affirm.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Korsmo, J.

WE CONCUR:

_____
Lawrence-Berrey, A.C.J.

_____
Pennell, J.

24